[636 NYS2d 799]

In the Matter of JOSEPH BIGMAN, a Suspended Attorney, and HARRY I. BIGMAN, a Suspended Attorney, Respondents. GRIEVANCE COMMITTEE FOR THE SECOND AND ELEVENTH JUDICIAL DISTRICTS, Petitioner.

Second Department, December 29, 1995

## APPEARANCES OF COUNSEL

*Robert H. Straus,* Brooklyn *(Richard Lombardo* of counsel), for petitioner.

*Fredric Lewis,* New York City, for respondents.

## OPINION OF THE COURT

Per Curiam.

In this proceeding, the respondents were charged with nine allegations of professional misconduct. The Special Referee sustained all charges except Charge Seven, which had been withdrawn. The petitioner moves to confirm the Special Referee's report while the respondents cross-move to disaffirm the report, to suspend all proceedings in this matter, and to direct that a full hearing be held as to the issues raised in the disciplinary complaint.

Charge One alleged that the respondents engaged in conduct that adversely reflects upon their fitness to practice law. John Yakub and Deow Gangaram were real estate investors and clients of the Bigmans. In the period from the early 1980's to approximately 1987, there was keen competition among New York banks for loans to be used for the purchase of homes. It became the practice in the banking industry that where the mortgagor or borrower paid at least 25% of the purchase price and submitted sworn statements that he or she would reside in the home, the bank would process the application without an independent check of the borrower's employment, net worth, or other information concerning the financial ability of the borrower to repay the loan. These low-documentation loans required a contract showing the down payment to be 25% of the purchase price of the home in order for the lending bank to lend up to 75% of the purchase price. The lending bank reviewed a statement of income, assets, and liabilities provided in the loan application; a report on the borrower's creditworthiness from an independent agency; a copy of the borrower's most recent Federal tax return; and an appraisal of the value of the new home or apartment. Banks relied heavily on the documents submitted on these applications without verifying the information contained therein.

On February 11, 1985, the Bigmans represented an individual in the purchase of a house for $130,000. On March 5, 1985, they represented another individual who entered into a flip contract to purchase that same house for $269,500. The Bigmans also represented this second individual in an application to the Dime Savings Bank of New York (hereinafter the Dime) for a low-documentation loan. Joseph Bigman filled out a form directing the Dime to issue a check from the loan proceeds in the sum of more than $83,000 to the order of his law firm. The form was signed in the client's name but not by the client. The $83,000 check was deposited into the respondents' escrow account.

In a real property transfer tax return required by New York City, Joseph Bigman falsely reported the transaction as an intrafamily transfer by one client to another. The signatures of both individuals, which Joseph Bigman notarized, were forged. The respondents represented the purchaser of a second house for the sum of $150,000 and represented the subsequent purchaser of the same house on the flip contract where the recited purchase price was $240,000. The Dime granted a mortgage loan in the amount of $181,500. Joseph Bigman directed the Dime to issue a check from the loan proceeds in the sum of $51,800 payable to himself. This purchase and flip contract occurred in November 1984.

In 1983 the Walden Terrace Apartments were converted to cooperative ownership under the sponsorship of F.B. Sponsors Corporation (hereinafter F.B. Sponsors). As of early 1986 the sponsor held more than 150 unsold apartments, some of which were occupied by tenants who were protected by the Rent Stabilization Law. The market value of an occupied apartment was less than 50% of the market value of a vacant apartment.

In the summer of 1985, the respondents, Yakub and Gangaram, entered into a conspiracy to obtain bank loans from deceptive flip contracts based on purchases of apartments in Walden Terrace from F.B. Sponsors. Yakub and Gangaram selected 50 occupied apartments as part of a plan to obtain mortgage loans based on the purchase price recited in the flip contracts. In addition, the respondents, Yakub and Gangaram, used the names of 28 individuals (hereinafter collectively the John Does) to further their scheme.

The draft of the contract of sale for the 50 apartments, which was negotiated by Joseph Bigman and the attorneys for F.B. Sponsors, was initially in the name of A.F.Y. Universal, Inc., a corporation formed by the respondents and controlled by

Yakub and Gangaram. The executed contract substituted MBK Holding Co. (hereinafter MBK) as the purchaser. MBK was wholly owned by Yakub and/or Gangaram and was formed by the respondents for the purpose of acting as purchaser of the Walden Terrace Apartments.

After the contract of sale was executed, it was assigned by MBK to 788 Bergen, Inc., another corporation controlled by Yakub and Gangaram and formed by the respondents. The respondents were listed as agent for the service of process on the corporations.

In negotiating the terms of the sale on behalf of the corporations controlled by Yakub and Gangaram, Joseph Bigman succeeded in eliminating from the final contract requirements for financial and character checks that were contained in the draft contract. F.B. Sponsors retained Tenant Data Verification to check the references. Harry Bigman verified as true the employment, experience, and income which Yakub and Gangaram stated.

The contract allowed the purchaser, MBK, to close title to the shares of a particular apartment on different dates. This allowed the respondents, Yakub, and Gangaram the opportunity to purchase each subsequent apartment by using the proceeds obtained from earlier bank loans based on the flip contracts.

The contract of sale, dated October 7, 1985, was signed by Yakub on behalf of MBK and provided for a $132,000 down payment. The total price of all shares in the 50 apartments was more than $1,600,000. Part of the money for the down payment emanated from a $100,000 loan from a private lending company which was obtained with the respondents' assistance.

For approximately 17 months after execution of the Walden Terrace contract on October 7, 1985, 37 loan applications were made to the Long Island Savings Bank (hereinafter LISB). These applications were supported by flip contracts signed by a "John Doe" and indicated that a cash down payment of 25% of the price stated in the flip contract would be made. The purchase price recited in the flip contract was usually twice the amount MBK had agreed to pay the sponsor. The flip contracts provided that the seller would deliver the apartment broom clean. The loan application provided that the borrower would reside in the apartment, which would be his or her primary residence. The respondents prepared the flip contracts and one of them attended the closings.

In 10 loan applications submitted to the Dime, the respondents listed an individual who shared office space with them as counsel for the borrower, without this individual's knowledge or consent. The respondents used this individual's name because the Dime had previously declined to close loans for the respondents' clients. The respondents caused loan proceeds from those transactions to be made payable to this individual and forged this individual's endorsement so that they could deposit these checks into their escrow account.

LISB verified the information contained in the applications by documents and information submitted by the borrower. All applications contained false information about the borrower's employment. The applications were also found to contain false tax returns. To verify the stated worth of the vacant apartments, as set forth in the flip contracts, the bank called an appraiser designated by the borrower. The appraiser's phone number was the same as the office of Yakub and Gangaram. The mortgage commitment sent out by the bank recited the condition that it was issued upon the borrower moving into the apartment which was the subject of the loan.

LISB's outside counsel routinely conducted a preclosing of the loan at which the borrower executed a promissory note, a loan security agreement, UCC-1 form, stock power, borrower's affidavits, the settlement statement showing the distribution of loan proceeds, and related documents.

A final closing was held at the offices of the sponsor or its managing agent within a few days of the preclosing. The documents transferring title to the property and a proprietary lease were delivered to the borrower at the closing. Checks representing the proceeds of the loan were delivered to the offices of the sponsor or managing agent by a messenger of the law firm representing LISB.

At the preclosing, one of the respondents represented the borrower named in the flip contract. The borrower executed the promissory note, the loan security agreement, the assignment of the proprietary lease from the borrower to the bank, and the stock power. The documents were purportedly reviewed by one of the respondents, who also witnessed the borrower's signature on a promissory note.

Knowing that occupancy of the apartment by the borrower was a material representation in the loan application, and a representation upon which the bank would rely in determining whether to grant the loan, the respondents advised the borrowers to sign an affidavit containing a false statement regarding

the borrowers' intent to move into the apartment no later than the final closing.

At the respondents' direction, the amount which was to be distributed to the borrower was, in most cases, distributed to the respondents' law firm. In instances where the proceeds were not so distributed, the respondents directed that the sums be sent to Kripter Management, Inc. (hereinafter Kripter), an entity which was organized by the respondents to receive the rents from the apartments on which loans had closed. Payments made to Kripter from the loan proceeds found their way into the respondents' escrow accounts. The respondents, Yakub, and Gangaram were careful not to be in default on the closed loans so that they might continue in their plan to receive the proceeds from loans yet to be closed.

In or about the spring of 1987, all 37 loans were in default. Investigators of LISB discovered, for the first time, that all 37 apartments were occupied by tenants and not by the borrowers. Foreclosure proceedings began in September 1987.

LISB also commenced an action in Federal court pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO; 18 USC § 1961 *et seq.*). In June 1991, the Honorable Jacob Mishler of the United States District Court for the Eastern District of New York ordered that judgment be entered in favor of the plaintiff in *Long Is. Sav. Bank v Bigman* (index No. CV-89-0927). By reason of the foregoing, the respondents violated Code of Professional Responsibility DR 1-102 (A) (7) (now [8]) (22 NYCRR 1200.3 [a] [7], [now (8)]).

All of the remaining charges emanate from the facts previously set forth.

Charge Two alleged that the respondents engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Code of Professional Responsibility DR 1-102 (A) (4) (22 NYCRR 1200.3 [a] [4]).

Charge Three alleged that the respondents engaged in illegal conduct involving moral turpitude in violation of Code of Professional Responsibility DR 1-102 (A) (3) (22 NYCRR 1200.3 [a] [3]).

Charge Four alleged that the respondents engaged in conduct that is prejudicial to the administration of justice in violation of Code of Professional Responsibility DR 1-102 (A) (5) (22 NYCRR 1200.3 [a] [5]).

Charge Five alleged that the respondents engaged in a conflict of interest in violation of Code of Professional Responsibility DR 5-105 (A) (22 NYCRR 1200.24 [a]).

Charge Six alleged that the respondents engaged in a conflict of interest in violation of Code of Professional Responsibility DR 5-105 (B) (22 NYCRR 1200.24 [b]).

Charge Eight alleged that the respondents knowingly used perjured testimony in violation of Code of Professional Responsibility DR 7-102 (A) (4) (22 NYCRR 1200.33 [a] [4]).

Charge Nine alleged that the respondents counselled and assisted their clients in conduct which the respondents knew to be illegal or fraudulent in violation of Code of Professional Responsibility DR 7-102 (A) (7) (22 NYCRR 1200.33 [a] [7]).

After reviewing all of the evidence adduced, we find that the Special Referee properly sustained Charges One through Six, Eight and Nine. The respondents' cross motion to suspend the proceedings and to direct that a full hearing be held on the issues raised in the petition is denied. In sustaining eight of the nine charges the Special Referee noted that in the Federal action, Judge Mishler stated that the allegations in the complaint had been established by clear and convincing evidence, a higher standard than the fair preponderance of the evidence required in a disciplinary proceeding. Inasmuch as the respondents were already afforded a full and fair opportunity to be heard in the Federal action, the respondents' cross motion is denied in its entirety.

In determining an appropriate measure of discipline to impose, we have taken into consideration the character evidence submitted by the respondents attesting to their reputation for honesty and personal involvement with their clients. The respondents' disciplinary histories are extensive. In December 1988, Harry Bigman received a Letter of Caution for stating falsely that he represented a claimant and for keeping a check payable to the claimant from an insurance carrier. In May 1986, Joseph Bigman was issued an Admonition for handling a matter for which he lacked the requisite experience, resulting in unnecessary delays; failing to respond to clients' inquiries; failing to answer the complaint from the Grievance Committee until subpoenaed; failing to protect a client's interests and to apprise him of the status of his purchase of a cooperative apartment; ignoring correspondence from the seller's attorney; and being less than candid with the Grievance Committee. In February 1987, Joseph was admonished for representing the seller and the buyer in a real estate transaction and bringing a lawsuit against his former client.

By opinion and order dated March 30, 1992 (178 AD2d 90), Joseph was suspended for two years for releasing funds to his

client after the sale of his business in violation of an escrow agreement and for failing to advise the attorneys for the buyer and the landlord that he was not holding escrow funds. Additionally, Joseph gave false assurances to said attorneys and the Grievance Committee that he was still holding these funds.

By opinion and order dated March 6, 1995 (208 AD2d 313), both respondents were suspended for three years for soliciting a $50,000 loan from their clients, giving the clients an unsigned, unrecorded mortgage on a parcel of real property owned by Joseph Bigman, and transferring title to the property to Harry's wife, in her maiden name, without advising the clients.

Under the circumstances, the respondents are disbarred.

MANGANO, P. J., BRACKEN, SULLIVAN, BALLETTA and THOMPSON, JJ., concur.

Ordered that the petitioner's motion to confirm the report of the Special Referee is granted; and it is further,

Ordered that the respondents' cross motion is denied in its entirety; and it is further,

Ordered that pursuant to Judiciary Law § 90, effective immediately, the respondents Joseph and Harry I. Bigman are disbarred and their names are stricken from the roll of attorneys and counselors-at-law; and it is further,

Ordered that the respondents shall continue to comply with this Court's rules governing the conduct of disbarred, suspended, and resigned attorneys (22 NYCRR 691.10); and it is further,

Ordered that pursuant to Judiciary Law § 90, effective immediately, the respondents Joseph and Harry I. Bigman are commanded to continue to desist and refrain (1) from practicing law in any form, either as principal or as agent, clerk, or employee of another, (2) from appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission, or other public authority, (3) from giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) from holding themselves out in any way as attorneys and counselors-at-law.